UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| UTICA TOWNSHIP VOLUNTEER FIRE FIGHTERS ASSOCIATION, | ) ) ) | CASE NO. 25-90840-AKM-11 |
| | ) | CHAPTER 11 (SUBCHAPTER V) |
| DEBTOR. | ) ) | (Joint Administration Requested) |
| | ) | |
| UTICA TOWNSHIP FIRE DEPARTMENT, INCORPORATED, | ) ) ) | CASE NO. 25-90841-AKM-11 |
| | ) | |
| DEBTOR. | ) ) | CHAPTER 11 (SUBCHAPTER V) |

## DECLARATION OF MATTHEW OWEN
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

\*\*\*   \*\*\*   \*\*\*

I, Matthew Owen, declare the following under penalty of perjury:

1. I am president of the Board of Directors of Utica Township Volunteer Fire Fighters Association d/b/a New Chapel EMS (the "Association") and chief executive officer of Utica Township Fire Department, Incorporated d/b/a New Chapel Fire & EMS (the "Department," together with the Association, the "Debtors," and each a "Debtor").

2. I submit this declaration (the "Declaration") in support of the Debtors' chapter 11 petitions and First Day Motions (as defined below). This Declaration is intended to assist the Court and other parties in gaining an understanding of the Debtors, their capital structure, the circumstances that led to the commencement of these chapter 11 cases (the "Chapter 11 Cases"), the Debtors' plans to emerge from chapter 11, and in support of the Debtors' petitions and motions requesting various types of "first day" relief (collectively, the "First Day Motions").

3. Due to my positions with the Debtors, I am familiar with the day-to-day operations, business, and financial affairs of each Debtor. Unless otherwise indicated, all statements made in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management or the Debtors' professionals, my review of the relevant documents, or my opinion based upon my experience with and knowledge of the Debtors' operations and financials. The Debtors authorize me to submit this Declaration. If called as a witness, I would be able to competently testify to the matters set forth in this Declaration.

4. On July 22, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Indiana (the "Court"), thereby commencing the Chapter 11 Cases. During the pendency of the Chapter 11 Cases, the Debtors intend to operate their business and manage their property as debtors in possession.

5. The Debtors enter bankruptcy with the goal of restructuring their secured debt and streamlining operations to maximize efficiency and cash flow.

I. **THE DEBTORS**

  A. **HISTORY OF THE ASSOCIATION AND DEPARTMENT**

6. The Association is an Indiana nonprofit organization incorporated on July 16, 1954, to provide fire fighting services to the residents of Utica Township, Clark County, Indiana, and surrounding areas.

7. In 1998, the Board of Commissioners for Clark County, Indiana (the "County Commissioners") passed an ordinance establishing the Utica Township Fire Protection District (the "District") under I.C. 36-8-11. The District is a governmental corporation that provides fire protection and prevention services to the residents of Utica

Township. Under Indiana law, the District can set its own tax rate and collect tax revenues.

8. The Department was formed in 2002 by Jamey Noel and others as an Indiana nonprofit corporation with the stated purpose of providing fire protection and emergency medical services.

9. Upon its creation, the District contracted with the Association for fire protection and prevention services. Until recently, the District contracted with either the Association or the Department, or both, to provide fire and emergency medical services, including fire protection, fire prevention, emergency medical services, and other related services (collectively, the "Services") to Utica Township.[1]

10. The District paid for the Services through funds received from annual property taxes and donations.

11. Following the establishment of the Department, the Association redirected its focus to providing emergency medical ambulance services. Townships in Clark County and Floyd County contracted with the Association for 911 ambulance services.

12. In addition to providing the Services to Utica Township, the Department also had contracts to provide the Services to the New Albany Township Fire District and the Franklin Township Trustee.

13. Although the Association and Department are separate entities, Mr. Noel served as both president and CEO of these organizations. While the Debtors shared a common CEO, Mr. Noel kept the finances and activities of each entity compartmentalized. For example, the Department employed David Kemplein as an accountant to oversee its finances and bookkeeping. In contrast, the Association employed Mr. Noel's daughter, Kasey Noel, to oversee its bookkeeping.

---

[1] It is unclear which Debtor the District contracted with as the only contract that has been located by the Debtors is from 2021 and is between the District and the Department.

B.     JAMEY NOEL'S THIEVERY

14. In August 2023, the Clark Circuit Court issued several search warrants against Mr. Noel, the CEO of the Association and Department. Those warrants encompassed Mr. Noel's personal property as well as property where the Association and the Department conducted business.

15. Soon after the warrants were executed, the oversight boards for the Association and Department held a meeting with Mr. Noel to discuss the warrants. Mr. Noel advised the board that the Indiana State Police seized all documents including each organization's bylaws and contracts. He also claimed that the warrants were a political witch hunt instigated by an adversarial politician.

16. The Indiana State Police did not present any evidence to the board or to counsel for the Association and Department of any alleged misconduct or wrongdoing by Mr. Noel.

17. Once Mr. Noel was arrested and charged in November 2023, the Association's board swiftly placed Mr. Noel on administrative leave and ultimately terminated his employment in January 2024. After being ousted from the Association, Mr. Noel resigned from the Department.

18. The state's investigation revealed that Mr. Noel used the Association's funds for impermissible and unauthorized purposes. Mr. Noel's numerous crimes include:

    (a)     trading Association and Department assets and property to convert the proceeds for his own personal use; and

    (b)     embezzling Association funds for his own personal use.

19. In early November 2023, Mr. Noel was charged with 15 criminal counts, primarily involving theft, with more charges added in 2024 to total more than 30 criminal counts. *See State of Indiana v. Jamey Noel*, Case No. 10C01-2311-F5-000297 (Clark Cir. Ct.

Nov. 8, 2023). The state identified the Association as a victim of most of Mr. Noel's criminal offenses.

20. From January 1, 2019, through 2023, Mr. Noel and his family members stole millions of dollars in assets from the Association. Ultimately, Mr. Noel pleaded guilty to most of the charges against him, including all the counts relating to his misuse of the Association's assets.

21. Until 2023, Mr. Noel had total control of the Debtors. In hindsight, some of Mr. Noel's actions should have been questioned by the board of directors; however, during Mr. Noel's tenure, he was a pillar of the community. He served as Sheriff for Clark County, was the chairman of the Republican Party for Clark County and Indiana's ninth congressional district, and served on a former governor's campaign committee.

22. In November of 2023, the board voted to remove Mr. Noel from power. Since February of 2024, I have served as President of the Board of the Association and chief executive officer of the Association and Department. My sole focus has been on cleaning up the stain that Mr. Noel left on the Debtors and charting a new path for the Debtors to serve the public using equipment, human capital, and other resources available to them.

### C. PENDING LITIGATION

#### 1. Board of Fire Trustees? Utica Township Fire Protection District

23. The District initiated a lawsuit against the Debtors and the Noel family in the Clark County Circuit Court on August 21, 2024, Case No. 10D06-2408-PL-000075 (the "District Action").

24. The District alleges it is entitled to damages primarily due to the misdeeds of the Noel family. The District also alleges that the Debtors are exercising control over the District's funds or equipment. The Court entered a preliminary injunction that

prevents the Debtors from selling, transferring, or otherwise disposing of any of the Debtors' property.

25. The District Action is currently pending.

### 2. State of Indiana ex rel: Todd Rokita Attorney General of Indiana

26. On May 10, 2024, the Indiana Attorney General filed a complaint in the Clark Circuit Court, Case No. 10C01-2405-PL-000038 (the "State Action"), to recover public funds that were misappropriated and diverted by the Noel family and Kevin Wilkerson. The Debtors intervened as plaintiffs in that action, asserting a claim to any funds that the State of Indiana recovers. The court also entered a preliminary injunction prohibiting the Debtors from selling or transferring any of the Debtors' property.

27. The State Action is currently pending. A mediation has been scheduled for August 26 and 27.

### D. EVENTS LEADING UP TO THE BANKRUPTCY FILING

28. Due to the misdeeds of Jamey Noel and certain members of his family, the District Action and the State Action have rendered the Debtors unable to thrive as viable businesses. Jamey's mismanagement and misappropriation of funds led to the Debtors losing valuable contracts to provide 911 services to various local communities. The preliminary injunctions issued in both the District Action and the State Action prevent the Debtors from maximizing their cash flow and streamlining their operations because the Debtors are prohibited from selling assets they no longer need.

29. The Debtors explored alternatives to bankruptcy but were stonewalled by the District and the State in their efforts to negotiate a solution.

30. In July 2025, the boards of directors for each Debtor, the Debtors' general counsel, the Debtors' outside counsel, and bankruptcy counsel convened during a special session to discuss bankruptcy and explore other alternatives. During that meeting, it

became apparent that the only path forward for the Debtors is through chapter 11 bankruptcy.

### E. THE DEBTORS' PREPETITION CAPITAL STRUCTURE

31. As of the Petition Date, the Debtors estimate that they have, in the aggregate, approximately $1.5 million in debt obligations, the vast majority of which are secured by title liens on vehicles for purchase money financing. More information about the Debtors' assets, debts, and property can be found in the Schedules.

32. The Association currently generates, on average, between $10,000 and $15,000 a week in revenue. It generates revenue by billing insurance companies for transporting patients via ambulance. The Debtors no longer have any contracts to provide 911 services. The Department does not generate any revenue.

## II. FIRST DAY MOTIONS

33. Concurrently with the filing of the Chapter 11 Cases, the Debtors filed the First Day Motions[2] requesting various forms of relief. Generally, the First Day Motions have been designated to meet the goals of: (a) preserving and protecting the Debtors' chapter 11 estates, including by paying certain claims of employees; (b) obtaining authorization to continue funding the Association's operations; (c) requesting permission to maintain and pay for insurance; and (d) establishing procedures for the smooth and efficient functioning of the Debtors' estates.

34. I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to reorganize successfully.

---

[2] Capitalized terms used but not otherwise defined in this section of the Declaration shall have the meaning ascribed in the applicable First Day Motion.

### A. JOINT ADMINISTRATION MOTION

35. By the Joint Administration Motion, the Debtors seek entry of an order directing (a) the consolidation and joint administration of these Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and S. D. Ind. B-1015-1 and B-9013-3; (b) the use of a single case docket and Bankruptcy Rule 2002 notice list in these cases; and (c) the use of a consolidated case caption.

36. I understand from counsel that Bankruptcy Rule 1015(b) provides, *inter alia*, that the court may order a joint administration of estates where, as here, two or more petitions are pending in the same court by a debtor and a related debtor entity. Fed. R. Bankr. P. 1015(b). Although the Debtors are two distinct entities, both Debtors share common management and boards of directors. I therefore believe that the Debtors are "affiliates," as that term is defined in 11 U.S.C. § 101(2).

37. I believe joint administration will significantly benefit the Debtors, the Court, the Office of the Clerk, the Office of the United States Trustee for Region 10 (the "U.S. Trustee"), and all other interested parties. Many of the motions, applications, notices, orders, and other documents that will be filed and entered in these Chapter 11 Cases will relate to, and affect, all of the Debtors collectively. Using a single, general case docket will relieve all parties—including the Court—of the burden and related expense of filing and entering duplicative documents in each of these Chapter 11 Cases and monitoring multiple dockets to stay apprised of developments in these cases before the Court.

38. I believe the Debtors will also realize substantial cost savings and reduced administrative burdens by sending a single set of notices to a single creditor matrix and Bankruptcy Rule 2002 list, as opposed to utilizing multiple sets of notices to multiple notice lists. Joint administration will simplify all aspects of the administration of the

Chapter 11 Cases and result in substantial cost savings to the Debtors and other parties in interest.

39. The Debtors also request that the Court approve and require for use on all documents filed and entered in the jointly administered cases the consolidated case caption listed in the Joint Administration Motion. I believe the consolidated caption will relieve parties from including each of the Debtors' names, tax identification numbers, and individual case numbers on all documents they file in the cases. This will further simplify the administration of the cases, help prevent confusion, and conserve resources.

40. Furthermore, I do not believe the rights of creditors and other interested parties will be prejudiced or otherwise affected in any way by the entry of an order directing the joint administration of these Chapter 11 Cases because this is not a motion for substantive consolidation of the Debtors' estates. An order of joint administration relates solely to the routine procedural administration of a case. Accordingly, I believe that the relief requested in the Joint Administration Motion is reasonable and appropriate under the circumstances and in the best interests of the Debtors and their estates.

**B. DEBTOR'S FIRST-DAY MOTION TO PAY EMPLOYEE WAGES, SALARIES, WITHHOLDING TAXES, BENEFITS, AND BUSINESS EXPENSES ("PAYROLL MOTION")**

41. By the Payroll Motion, the Debtors request entry of an order (a) authorizing, but not directing, the Debtors, per their existing policies to (i) pay all prepetition wages, salaries, and other compensation owed to the Debtors' employees, (ii) reimburse prepetition business expenses incurred by the Debtors' employees, (iii) pay prepetition employee tax and other withholdings to third-parties, (iv) maintain and make contributions to prepetition health and other employee benefit programs, and (v) honor prepetition workers' compensation obligations and other insurance premiums; (b)

authorizing and directing the Debtors' Banks to honor and process check and electronic transfer requests related to the foregoing; and (c) granting such other and further relief as may be appropriate.

42. As of the Petition Date, the Association employed eight full-time employees and three part-time employees (each an "Employee" and collectively, the "Employees"). None of the Employees are subject to a collective bargaining agreement.

43. The Debtors' ability to preserve the value of their business and successfully navigate chapter 11 is dependent on the expertise and continued enthusiasm and service of their Employees. The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring. The Employees' skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Employees include highly trained personnel who cannot be easily replaced during this critical juncture of these cases and without whom the Debtors' reorganization efforts likely will be jeopardized.

44. In the ordinary course of business, the Debtors maintain various employee benefit plans and policies that provide eligible Employees with medical and 401(k) plans ("Employee Benefit Obligations"). The Debtors also provide workers' compensation benefits to eligible Employees. To offer better value and lower costs to the Employees, the Debtors pooled together their benefit plans for medical, vision, dental, life insurance, and retirement.

45. The Debtors pay the Employees biweekly on Fridays, one week in arrears. The expenses related to wages and the Employee Benefit Obligations are as follows:

    (a) Wages: approximately $16,000 per week.

    (b) Health Insurance: approximately $7,085.17 per month.

    (c) Retirement: $350 per pay period.

46. Overall, I believe that the relief requested by the Debtors pursuant to the Employee Wage Motion is reasonable and appropriate under the circumstances and in the best interests of the Debtors' estates.

### C. DEBTOR'S FIRST DAY MOTION FOR AN ORDER AUTHORIZING DEBTOR TO (A) MAINTAIN EXISTING INSURANCE POLICIES AND PAY ALL POLICY PREMIUMS AND BROKERS' FEES ARISING THEREUNDER AND (B) CONTINUE INSURANCE PREMIUM FINANCING PROGRAMS AND PAY INSURANCE PREMIUM FINANCING OBLIGATIONS ARISING THEREUNDER OR IN CONNECTION THEREWITH ("INSURANCE MOTION")

47. Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (a) continue to maintain and administer their prepetition insurance policies and revise, extend, renew, supplement, or replace such policies, as needed, (b) pay or honor prepetition obligations outstanding on account of the Debtors' Insurance Obligations (as defined below), and (c) continue to maintain their premium finance agreement and revise, extend, renew, supplement, or replace such agreement, as needed.

48. In connection with the operation of its business and management of its property, the Debtors maintain various Insurance Policies. The Insurance Policies include coverage for, among others, workers' compensation claims, commercial automobile claims, fiduciary liability claims, claims for losses due to crime, accident claims, certain general and excess liability claims, directors' and officers' liability, employers' liability, cyber-related liabilities, and various property-related liabilities. The third-party claims covered by the Insurance Policies are neither unusual in amount nor in number, considering the extent and nature of the Debtors' business operations. The Debtors maintain the Insurance Policies through various third-party Insurance Carriers. The names of the Insurance Policies, the Insurance Carriers, the term of the current

policy, and the Insurance Policies' annual premiums are set forth on Exhibit A attached to the Insurance Motion.[3]

49. It was not economically feasible for the Debtors to pay the premiums on all of the Insurance Policies on a lump-sum basis, so in the ordinary course of business, the Association entered into secured promissory notes to finance its premium payment for general liability, cyber, and automobile liability insurance policies through AFCO Credit Corporation ("AFCO").

50. Pursuant to the Association's finance agreement with AFCO, the total amount of financed insurance premiums is $77,554.21 with an annual percentage rate of 10.25%, payable in monthly installments of $8,124.41. Prior to the Petition Date, the Association made a down payment of $13,686.04 toward the AFCO financing agreement.

51. To secure their payment obligations, the Association assigned to AFCO (a) a security interest in the policies that AFCO finances and any sums payable to the Debtors under such Insurance Policies (such as return premiums, dividend payments and loss payments) and (b) in any circumstance in which the premiums related to any of the AFCO policies could become fully earned in the event of loss, the right to be named a loss-payee under those policies.

52. The Insurance Policies are essential to the preservation of the value of the Debtors' business, property, and assets. In addition, in many cases, the coverage provided under the Policies is required by various laws and contracts that govern the Debtors' commercial activities, and as such, is necessary for the continuation of the Debtors' business operations.

---

[3] In addition to the Insurance Policies listed on Exhibit A, the Debtor maintains other insurance policies and programs with respect to employee benefits including, without limitation, health, dental, and disability insurance. These programs and policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtor's employee wage policies and benefit programs.

53. The Debtors are not aware of any finance company that will provide insurance premium financing to the Debtors on an unsecured basis. If the Debtors are unable to continue to make the payments due under the Finance Agreements, AFCO may seek relief from the automatic stay to cancel the policies and collect any unearned premiums. The Debtors would then be required to obtain replacement insurance on an expedited basis and at a substantial cost to the estates. Any cancellation or suspension of the policies financed by AFCO would also place the Debtors' enterprise at risk of noncompliance with various laws. It may also result in a loss of value for the Debtors' going concern value if a casualty, natural disaster, accident, or other unforeseen event occurs during the ordinary course of their business. If the Debtors were required to obtain replacement insurance and make a lump-sum payment regarding the policies financed by AFCO and/or the Finance Agreement in advance, this payment would likely be greater than what the Debtors currently pay. Thus, any interruption of payment would have a severe and adverse effect on the Debtors' ability to finance premiums for future policies, putting the Debtors at risk.

54. I, therefore, believe that the relief requested in the Insurance Motion is reasonable and appropriate under the circumstances and in the best interests of the Debtors' estates.

### D. MOTION FOR AN ORDER APPROVING INTERIM USE OF CASH COLLATERAL ("CASH COLLATERAL MOTION")

55. By the Cash Collateral Motion, the Debtors request authority to use cash collateral within the meaning of section 363(a) of the Bankruptcy Code, pursuant to section 363(c) of the Bankruptcy Code.

56. Upon reviewing the Debtors' records and searching the Indiana Secretary of State website for financing statements issued against the Debtors, bankruptcy counsel was unable to locate any record that indicates there are liens against the Debtors' cash collateral.

57. In the District Action, the District alleges that it owns all the Debtor's property and requests the court provide permanent injunctive relief and specific performance prohibiting Defendants from selling any property, regardless of how such property is currently titled. The District's legal basis for asserting ownership over the Debtor's assets is unclear. A copy of the Complaint filed in the District Action is attached as Exhibit A to the Cash Collateral Motion.

58. I do not believe that the District has any interest, let alone an ownership interest, in the Debtors' property, including cash collateral. Moreover, I believe, after consulting with the Debtors' counsel, that the preliminary injunction issued in the District Action is stayed pursuant to 11 U.S.C. § 362(a).

59. Nonetheless, out of an abundance of caution, the Debtors request authorization to use their cash, whether it is cash collateral or not, to pay actual, necessary ordinary course operating expenses, as set forth in the Initial Budget, which includes the costs and expenses associated with maintaining the Debtors' operations and to maximize the Debtors' going concern value.

60. Absent the use of the Cash Collateral, I believe the Debtors will be unable to meet their ongoing obligations. Approval of the interim use of Cash Collateral is crucial and necessary under the facts and circumstances of these cases. Without such use, the Debtors would face immediate and irreparable harm, and their assets would markedly diminish in value going forward.

61. I believe that obtaining the use of Cash Collateral is imperative to the Debtors, their estates, their creditors, and their ability to continue their operations. The Debtors are therefore asking this Court to authorize the Debtors to use Cash Collateral pursuant to the Initial Budget. I believe that the use of Cash Collateral on the terms set forth in the proposed Interim Order submitted with the Cash Collateral Motion maximizes the value of the Debtors' assets for the benefit of all stakeholders.

*-     Remainder of page intentionally left blank     -*

I, Matthew Owen, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 22, 2025

*(signature)*

MATTHEW OWEN

*President of the Board of Directors*, Utica Township Volunteer Firefighters Association

&

*Chief Executive Officer*, Utica Township Fire Department Incorporated

*C:\Users\JHH\Desktop\Declaration Matthew Owen (002).docx*